IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

METROPOLITAN LIFE
INSURANCE COMPANY,

   Plaintiff,

  v.

GARRETT PUZZO,

   Defendant.

CIVIL ACTION FILE
NO. 1:13-CV-3858-TWT

**OPINION AND ORDER**

This is a breach of contract action. It is before the Court on the Defendant Garrett Puzzo's Motion to Stay Action and Compel Arbitration [Doc. 11]. For the reasons set forth below, the Defendant's Motion to Stay Action and Compel Arbitration [Doc. 11] is DENIED.

**I. Background**

The Defendant Garrett Puzzo was the Managing Director of the Plaintiff Metropolitan Life Insurance Company's Atlanta, Georgia agency. (Compl. ¶ 10.) On February 16, 2010, the Plaintiff and the Defendant entered into a non-solicitation agreement as a condition of the Defendant's continued employment. (Compl. ¶ 10.) The non-solicitation agreement stipulated that while the Defendant was employed

with the Plaintiff, and for eighteen months following a termination of that employment, the Defendant would "not induce or attempt to induce, or assist in the inducement of, or facilitate any person in the employ of MetLife to leave MetLife's employ . . .." (Compl. ¶ 11.)

On October 23, 2012, the Defendant's employment with the Plaintiff was terminated. (Compl. ¶ 13.) Then, on November 28, 2012, the Plaintiff and the Defendant entered into a separation agreement. (Compl. ¶ 14.) In exchange for severance pay of $219,795.00, the Defendant: "(a) waived all potential claims against MetLife that arose out of or related to his employment and/or termination; and (b) reiterated his promise to abide by his Non-Solicit Agreement." (Compl. ¶¶ 15-16.) The separation agreement stipulates that if the Defendant breaches the non-solicitation agreement, he must return seventy-five percent of his severance pay. (Compl. ¶ 17.)

After his tenure with the Plaintiff had ended, the Defendant joined Prudential Financial, Inc. as the Managing Director of its agency in Tampa, Florida. (Compl. ¶ 19.) Prudential is a competitor of the Plaintiff. (Compl. ¶ 19.) As part of his duties, the Defendant is responsible for recruiting and hiring agents for Prudential. (Compl. ¶ 20.) Additionally, the Defendant's consent is required before an agent may be assigned to Prudential's Tampa agency. (Compl. ¶ 25.)

The Plaintiff alleges that the Defendant successfully recruited three employees of the Plaintiff's Atlanta agency to join Prudential's Tampa agency. (Compl. ¶¶ 21-24.) The Plaintiff alleges that the Defendant was responsible for hiring these three agents, and at minimum consented to their hire. (Compl. ¶ 25.) The Plaintiff filed suit, asserting a contract claim against the Defendant. The Plaintiff argues that because the Defendant breached the non-solicitation agreement, the Plaintiff is entitled to restitution – under the separation agreement – of seventy-five percent of the Defendant's severance pay; or, $164,845.25. The Plaintiff is not seeking equitable relief or any other form of damages. The Defendant now moves, under 9 U.S.C. §§ 3-4, to stay this action and compel arbitration.

## II. Legal Standard

"The liberal federal policy favoring arbitration agreements . . . is at bottom a policy guaranteeing the enforcement of private contractual arrangements." <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 625 (1985). When considering a motion to compel arbitration, the Court must first "determine whether the parties agreed to arbitrate that dispute." <u>Id.</u> at 626. If they have, the Court must then determine whether the arbitration clause is valid. It may be unenforceable on grounds that would permit the revocation of any contract, such as fraud or unconscionability. See <u>id.</u> at 627 ("[C]ourts should remain attuned to well-supported

claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'") (citing 9 U.S.C. § 2). There may also be legal constraints precluding arbitration, such as a clear congressional intention that a certain claim be heard in a judicial forum. See id. at 628 ("Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983).

### III. Discussion

The question before the Court is whether the Financial Industry Regulatory Authority ("FINRA") Arbitration Code requires the Plaintiff to arbitrate its contract claim.[1] When the Defendant began his employment with the Plaintiff, the latter was

---

[1] To be specific, the parties claim that the relevant arbitration agreement is the arbitration clause in the Form U-4 that the Defendant signed upon beginning his employment with the Plaintiff. This arbitration clause simply incorporates the Arbitration Code of the NASD (FINRA's predecessor), "as may be amended from time to time." (Puzzo Decl., Ex. B.) Because the Arbitration Code independently serves as a binding arbitration agreement, see Multi-Financial Securities Corp. v. King, 386 F.3d 1364, 1367 (11th Cir. 2004) ("Although there is no direct written

a member of the National Association of Securities Dealers ("NASD"), the predecessor to the FINRA.[2] The Plaintiff terminated its membership on July 9, 2007, (Pl.'s Resp. to Def.'s Mot. to Compel Arbitration, at 8), years before any of the material events giving rise to this action occurred.[3] The arbitration requirement found in the FINRA Arbitration Code – Rule 13200 – states:

> Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute *arises out of the business activities of a member or an associated person* and is between or among: [1] Members; [2] Members and Associated Persons; or [3] Associated Persons."

(Alonso Decl., Ex. 1) (emphasis added). Additionally, the FINRA Arbitration Code defines "member" as "any broker or dealer admitted to membership in FINRA,

---

agreement to arbitrate between IFG and King, the [NASD] Code serves as a sufficient written agreement to arbitrate, binding its members . . .."); MONY Securities Corp. v. Bornstein, 390 F.3d 1340, 1342 (11th Cir. 2004) ("MONY . . . argu[es] that the Bornsteins are not eligible for arbitration because there was never an agreement to arbitrate . . . [but] the NASD Code itself constitutes the agreement."), the Court need not focus on the Form U-4.

[2] "On July 26, 2007, NYSE and NASD were consolidated . . . [and] [t]he 'expanded' NASD was then renamed the Financial Industry Regulatory Authority, i.e., FINRA." Lewis v. UBS Fin. Servs. Inc., 818 F. Supp. 2d 1161, 1165-66 (N.D. Cal. 2011). "Given that FINRA is merely the successor entity to NASD, courts have compelled arbitration before FINRA where, as in this case, the arbitration agreement specifies that arbitration will occur under the rules of NASD." Id. at 1166.

[3] The earliest event material to this litigation occurred in February of 2010, when the Defendant signed the non-solicitation agreement. (Compl. ¶ 10.)

*whether or not the membership has been terminated or cancelled . . . .*" (Alonso Decl., Ex. 2) (emphasis added).

The parties disagree as to whether the Plaintiff was a FINRA "member" at the time of the events giving rise to this action. The Defendant argues that the clause "whether or not the membership has been terminated or cancelled" found within the "member" definition suggests that a broker or dealer that terminates its membership does not cease to be a FINRA member – at least for the purposes of the FINRA Arbitration Code. (Def.'s Mot. to Compel Arbitration, at 8-9.) Conversely, the Plaintiff argues that this clause is not meant to expand the definition of "member" to include those that have terminated their membership. Rather, the clause simply clarifies that a broker or dealer that *was* a member during the events giving rise to the claim must arbitrate that claim regardless of whether its membership has since ended. (Pl.'s Resp. to Def.'s Mot. to Compel Arbitration, at 11-15.) Thus, the Plaintiff argues, because it terminated its FINRA membership prior to the events giving rise to its contract claim, the FINRA arbitration requirement is inapplicable. (Id.) The Court agrees with the Plaintiff, and concludes that – as per the FINRA Arbitration Code – a broker or dealer is a FINRA "member" if it has been admitted to membership in FINRA, and it may be subject to the FINRA arbitration requirement as long as its

membership has not been terminated or cancelled prior to the material events giving rise to the dispute.[4]

To start, when "construing an arbitration clause, courts . . . must give effect to the contractual rights and expectations of the parties . . . [and] [i]n this endeavor, as with any other contract, the parties' intentions control."[5] Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 682 (2010) (internal quotation marks

---

[4] At least one other District Court has construed the FINRA arbitration requirement in a similar manner. See Biremis, Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc., CV-11-4934 LDW, 2012 WL 760564, at *2 (E.D.N.Y. Mar. 8, 2012) ("It is clear that Biremis and Merrill Lynch were both FINRA members *at the time of the [contract]* . . . they are therefore bound to arbitrate any dispute arising out of their business relationship[,] [and] [t]he subsequent cancellation of Plaintiff[']s broker dealer status does not change the court's conclusion.").

[5] The Eleventh Circuit has stated that a court must "interpret the [NASD] Code as it would a contract *under the applicable state law* . . . giving effect (as it does when interpreting any contract) to the parties' intent expressed by the ordinary meaning of the language they used." King, 386 F.3d at 1367 (emphasis added). Neither party specifies which state law governs interpretation of the FINRA rules. "A number of agreements pursuant to which FINRA was formed state that they are governed by Delaware law." UBS Fin. Servs., Inc. v. West Virginia Univ. Hospitals, Inc., 660 F.3d 643, 649 n.3 (2d Cir. 2011). However, "[i]n interpreting the FINRA Rules, [the Court] need not reach the issue of which state law applies." Id. at 649. "Under New York . . . or Delaware law, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms[.]" Id. (internal quotation marks omitted). And the same is true under Georgia law. See CareAmerica, Inc. v. Southern Care Corp., 229 Ga. App. 878, 880 (1997) ("If [the language is clear and unambiguous], the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning.").

omitted). And "[w]hile ambiguities in the language of the agreement should be resolved in favor of arbitration . . . we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294 (2002); see also Goldberg v. Bear, Stearns & Co., Inc., 912 F.2d 1418, 1419-20 (11th Cir. 1990) ("The courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties."). Here, the Defendant's interpretation – that an entity which has terminated its membership remains a "member" – could not have been intended by the parties to the FINRA Arbitration Code. Aside from being illogical, the reading "preferred by [the Defendant] would do significant injustice to the reasonable expectations of [FINRA] members." Wheat, First Securities, Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993). The Court "cannot imagine that any [FINRA] member would have contemplated that its [FINRA] membership" would perpetually subject it to FINRA's arbitration requirement, even for causes of action arising long after its membership had ended. Id.

Additionally, the history leading up to the current version of the FINRA Arbitration Code supports the Plaintiff's reading. Unlike the FINRA Arbitration Code, the former NASD Arbitration Code did not include its own definition of "member."

See generally NASD Code of Arbitration, http://www.finra.org/web/groups/arbitrationmediation/@arbmed/@arbion/documents/arbmed/p018653.pdf (last updated April 2, 2007). Thus, when interpreting the NASD Arbitration Code, courts relied on the general "member" definition found in the NASD By-laws. See, e.g., Burns v. New York Life Ins. Co., 202 F.3d 616, 619 (2d Cir. 2000); Marcus v. Masucci, 118 F. Supp. 2d 453, 456 (S.D.N.Y. 2000). This definition indicated that a "member" was "any broker or dealer admitted to membership in the NASD." McMahan Sec. Co. L.P. v. Forum Capital Markets L.P., 35 F.3d 82, 86 (2d Cir. 1994) (internal quotation marks omitted). It did not include the additional clause at issue here. As a consequence, it was unclear *when* a party had to be an NASD "member" in order to be subject to its arbitration requirement. This very question arose in Riccard v. Prudential Ins. Co., 307 F.3d 1277 (11th Cir. 2002). There, when the defendant moved to compel arbitration, the plaintiff argued that the NASD arbitration requirement was inapplicable because the defendant was no longer an NASD member when the lawsuit was filed. See id. at 1287 ("Riccard assumes that NASD membership . . . must be judged at the time of the motion to compel or at least at the time of the filing of the lawsuit which resulted in the motion."). In response, the defendant argued "that status as an NASD member should be judged at the time of the events leading to the dispute or claim or when the dispute or claim arose." Id.

Although the court ultimately sided with the defendant, it nonetheless acknowledged that the NASD Arbitration Code was ambiguous on this question. See id. ("The language . . . is somewhat ambiguous on this point."). The court explained:

> On the one hand, [the NASD Arbitration Code] speaks of arbitration "at the instance" of a member or person associated with a member, which seems to suggest that the party insisting upon arbitration would have to be a member or associated with a member at the time it did the insisting. On the other hand, the language speaks of the disputes, claims, and controversies that are subject to mandatory arbitration as being those "arising" in connection with the business of a member or "arising" out of the employment or termination of employment of persons associated with a member, and that sounds as though the focus is on membership at the time of the "arising" of the dispute, claim, or controversy.

Id. at 1287-88. Against this backdrop, it is likely that the additional clause found in the "member" definition of the FINRA Arbitration Code is meant to clarify that a party's membership status at the time of litigation is immaterial. Accordingly, because the Plaintiff was not a FINRA member when the material events giving rise to this action occurred, its contract claim is not subject to the FINRA arbitration requirement.

## IV. Conclusion

For these reasons, the Court DENIES the Defendant's Motion to Stay Action and Compel Arbitration [Doc. 11].

SO ORDERED, this 2 day of May, 2014.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge